# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-13-00094-CV
---

**Center for Food Safety, John Does 1 and 2, Darla Cherry, and Jennifer Lopez, Appellants**

**v.**

**David Lakey, in his official capacity as the Commissioner of the Texas Department of State Health Services, and the Texas Department of State Health Services, Appellees**

---
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
### NO. D-1-GN-10-004362, HONORABLE GISELA D. TRIANA, JUDGE PRESIDING
---

## M E M O R A N D U M   O P I N I O N

Appellants Center for Food Safety,[1] John Does 1 and 2, Darla Cherry, and Jennifer Lopez sued appellees the Texas Department of State Health Services (DSHS) and its Commissioner David Lakey, seeking injunctive, declaratory, and mandamus relief to compel them to administer and enforce section 821.003 of the Texas Health and Safety Code. *See* Tex. Health & Safety Code § 821.003. Appellees filed a plea to the jurisdiction, and the trial court granted the plea. For the reasons that follow, we affirm the trial court's order dismissing appellants' claims.

## BACKGROUND

At the crux of the parties' dispute is section 821.003 of the Health and Safety Code, which addresses the treatment of live birds. *See id*. Appellants, several Texas residents and the

---

[1] The Center for Food Safety describes itself as a national public interest group dedicated to protecting its members from the risks of unsafe food sources.

Center for Food Safety, sued DSHS and its commissioner seeking to compel DSHS to enforce section 821.003.[2] They alleged that egg producers were operating in violation of section 821.003, that DSHS had a mandatory, ministerial duty to enforce the section, and that it had failed to discharge that duty, thereby threatening the health and safety of Texas citizens because "unsanitary conditions in Texas egg production facilities" were a "serious public health risk," "caused primarily by operation practices including overcrowding cages with too many hens" and that "[t]hese conditions increased the likelihood of Salmonella and other food-borne disease outbreaks from eggs destined for human consumption."

Section 821.003 is found within Title 10 ("Health and Safety of Animals"), Chapter 821 ("Treatment and Disposition of Animals"), and Subchapter A ("Treatment of Animals"). Subsection (a) of the section lists the persons that are subject to its requirements:

a)      This section applies to a person who receives live birds for transportation or for confinement:

(1)      on wagons or stands;
(2)      by a person who owns a grocery store, commission house, or other market house; or
(3)      by any other person if the birds are to be closely confined.

---

[2] Appellants also initially sued the Texas Health and Human Services Commission, the Department of Agriculture, the Texas Animal Health Commission, and their respective commissioners but later nonsuited them.

*Id.* § 821.003(a). Subsections (b) to (e) then describe requirements for treating live birds, such as requiring "clean water and suitable food" and not exposing the birds to "undue heat or cold." *Id.* § 821.003(b)–(e).[3]

DSHS and its commissioner filed a plea to the jurisdiction and motion for summary judgment.[4] Among the grounds raised in their plea, they argued that DSHS did not have a mandatory duty to enforce section 821.003, and, therefore, that appellants did not have standing because they

---

[3] Subsections (b) to (e) of section 821.003 state in their entirety:

(b)     The person shall immediately place the birds in coops, crates, or cages that are made of open slats or wire on at least three sides and that are of a height so that the birds can stand upright without touching the top.

(c)     The person shall keep clean water and suitable food in troughs or other receptacles in the coops, crates, or cages. The troughs or other receptacles must be easily accessible to the confined birds and must be placed so that the birds cannot defile their contents.

(d)     The person shall keep the coops, crates, or cages in a clean and wholesome condition and may place in each coop, crate, or cage only the number of birds that have room to move around and to stand without crowding each other.

(e)     The person may not expose the birds to undue heat or cold and shall immediately remove all injured, diseased, or dead birds from the coops, crates, or cages.

Tex. Health & Safety Code § 821.003(b)–(e).

[4] DSHS challenged the trial court's jurisdiction based on sovereign immunity and appellants' lack of standing. *See Andrade v. NAACP*, 345 S.W.3d 1, 7 (Tex. 2011) ("Generally, a citizen lacks standing to bring a lawsuit challenging the lawfulness of governmental acts."); *Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex. 1998) (explaining that standing and ripeness focus on "the need for a concrete injury for a justiciable claim to be presented"); *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993) ("The general test for standing in Texas requires that there '(a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought.'").

had failed to state a valid claim under section 821.003. Appellants filed a response, and both parties submitted evidence to support their positions.

After a hearing in 2013, the trial court granted the plea and dismissed appellants' claims for lack of subject matter jurisdiction. In its order, the trial court stated the following grounds for its ruling:

- The Court finds that while Section 821.003 of the Health & Safety Code has a sanitation component, the intent of the statute is to prevent animal cruelty. Defendants may consider violations of Section 821.003 for purposes of their primary authority to prevent communicable diseases and may report violations under Section 821.003 to other authorities, but the primary enforcement mechanism for Chapter 821 is through peace officers and animal control officers not Defendants.

- The Court also finds that Defendants' ability to address the potential for disease transmission is extensive in egg farms. Defendants have the authority to inspect such egg farms under their general powers, particularly in light of their enumerated powers under Chapter 81 including Sections 81.004, 81.021, 81.061, and 81.064. Additionally, state and local officials may assist federal agencies with federal requirements regarding salmonella in eggs within its own jurisdiction pursuant to federal regulations as shown by 21 C.F.R.§ ll8.12(c) and (d).[5]

- Defendant State Health Services and its Commissioner have the authority to inspect egg farms since a potential outbreak could affect human health. Given the repeated national examples of humans becoming sick from salmonella and other diseases being spread by unsanitary conditions at farms or other food production facilities, Defendants are not restricted to only taking regulatory or administrative action after an outbreak of such communicable diseases occurs.

---

[5] Section 118.12 addresses enforcement and compliance with the production, storage, and transportation of shell eggs, authorizes the federal Food and Drug Administration to inspect egg production establishments, and allows state and local cooperation. *See* 21 C.F.R. § 118.12.

• While Defendants do not lack authority to investigate egg farms regarding their sanitary conditions, they are given broad discretion in how and when to exercise that power. Accordingly, the Court finds that it lacks jurisdiction to provide the remedy requested by Plaintiffs.

This appeal followed.

## ANALYSIS

In their sole issue, appellants contend that the trial court erred by granting appellees' plea to the jurisdiction because DSHS and its commissioner (collectively DSHS) have a mandatory, nondiscretionary duty to enforce section 821.003. They urge that section 821.003 is a "health law" within the meaning of section 12.021 of the Health and Safety Code and that section 12.021 imposes a mandatory duty on DSHS to "administer and enforce the health laws of this state." *See* Tex. Health & Safety Code § 12.021 (stating that the "commissioner shall administer and enforce the health laws of this state under the board's supervision").[6] They urge that "shall means shall" in section 12.021, *see* Tex. Gov't Code § 311.016(2) ("'Shall' imposes a duty."), which in turn creates an affirmative duty to enforce the health laws including section 821.003.

This appeal is from the grant of a plea to the jurisdiction, but appellants' issue turns on statutory construction. Our standard of review in either context is de novo and well-established.

_____

[6] The parties join issue with whether section 12.021 applies to DSHS. Section 12.021 expressly refers to the commissioner of the Texas Department of Health. Tex. Health & Safety Code § 12.021. In 2003, the Texas Department of Health and the Board of Health were abolished and their powers transferred to newly formed agencies, including DSHS. *See id.* § 11.003 (noting that Texas Board of Health and Texas Department of Health were abolished in 2003 and that "the powers and duties of those entities under this chapter were transferred to other agencies"), § 1001.071 (listing responsibilities of DSHS); *see also* H.B. 2292, 78th Leg., R.S., ch. 198, § 1.19, 2003 Tex. Gen. Laws 198. For purposes of this appeal, we assume without deciding that section 12.021 applies to DSHS.

*See Texas Mun. Power Agency v. Public Util. Comm'n*, 253 S.W.3d 184, 192 (Tex. 2007) (stating standard of review of statutory construction); *see also Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004) (stating standard of review of trial court's ruling on plea to jurisdiction). We begin with the plain language of section 821.003, reviewing it in the context of the broader statutory scheme. *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) (construing statute in context of statutory scheme); *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010) (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)) (construing "the text according to its plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results"); *20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008) (considering statute's "role in the broader statutory scheme").

As previously stated, section 821.003 is found within Title 10, titled "Health and Safety of Animals," Chapter 821, titled "Treatment and Disposition of Animals," and Subchapter A, titled "Treatment of Animals."[7] The other subchapter of chapter 821, subchapter B titled "Disposition of Cruelly Treated Animals," provides the procedures for enforcing violations of subchapter A. It sets out the procedures to obtain a warrant to seize an animal, a hearing with possible dispositions for the animals, and an appeal. *See* Tex. Health & Safety Code §§ 821.021–.026.

---

[7] In addition to section 821.003, subchapter A also has a section defining "animal," a section addressing the treatment of impounded animals, and a section addressing the knowledge and acts of a corporate agent or employee. *See* Tex. Health & Safety Code §§ 821.001–.004.

Within subchapter B, section 821.022 contains the starting point for enforcing subchapter A violations. Titled "Seizure of Cruelly Treated Animals," it states:

a) If a peace officer or an officer who has responsibility for animal control in a county or municipality has reason to believe that an animal has been or is being cruelly treated, the officer may apply to a justice court or magistrate in the county or to a municipal court in the municipality in which the animal is located for a warrant to seize the animal.

(b) On a showing of probable cause to believe that the animal has been or is being cruelly treated, the court or magistrate shall issue the warrant and set a time within 10 calendar days of the date of issuance for a hearing in the appropriate justice court or municipal court to determine whether the animal has been cruelly treated.

(c) The officer executing the warrant shall cause the animal to be impounded and shall give written notice to the owner of the animal of the time and place of the hearing.

*Id.* § 821.022; *see also id.* § 821.021(1) (defining "cruelly treated" to include "tortured," "unreasonably deprived of necessary food, care, or shelter," and "cruelly confined").

Under the plain reading of section 821.022, the legislature expressly places responsibility on local law enforcement officers to enforce chapter 821, including section 821.003, by authorizing the officers to take action if they have "reason to believe that an animal has been or is being treated cruelly." *See id.* § 821.022. Further, section 821.003's placement in chapter 821 of title 10 makes clear that its focus is upon the manner of treatment of animals. In contrast, other chapters of the Health and Safety Code expressly address the protection of human health, as opposed to animal cruelty. *See, e.g.*, *id.* § 11.002 (creating Texas Board of Health and Texas Department of Health "to better protect and promote the health of the people of this state"), § 12.001(b)(2)

7

(requiring Board of Health to "examine, investigate, enter, and inspect any public place . . . as the board determines necessary for the discovery and suppression of disease and the enforcement of any health and sanitation law of this state"), § 81.021 (requiring Board of Health to "exercise its powers in matters relating to protecting the public health to prevent the introduction of disease into the state").

Appellants concede that a purpose of section 821.003 is to protect against the cruel treatment of animals, but they urge that, on its face, the section has dual purposes. They argue that an additional purpose is public health and sanitation, and that this purpose makes the statute a "health law" within the scope of section 12.021. Appellants point to the required minimum sanitation conditions, such as the prompt removal of dead birds, *see id*. § 821.003(e), which they assert has the effect of preventing and controlling the transmission of communicable diseases, and the inclusion of persons who are in the food supply chain. *Id*. § 821.003(a) (including a "person who owns a grocery store, commission house, or other market house"). To support their dual purpose argument, appellants contrast section 821.003 with section 821.002 and point to sections of chapter 829.

Section 821.002(a) requires "[a] person who impounds or causes the impoundment of an animal" to "supply the animal with sufficient wholesome food and water during its confinement." *Id*. § 821.002(a). Appellants argue that, in contrast with section 821.003, section 821.002 does not have an additional purpose of public health and sanitation and that the difference between the two sections makes sense because impounded animals are not kept for human food production or consumption. But impounded animals under chapter 821 may be sold for food

8

production or consumption. *See id*. § 821.024 (allowing public auction of impounded animals). Further, addressing impounded animals separately from live birds makes sense in the context of the statutory scheme. Section 821.002 applies to "[a] person who impounds or causes the impoundment of an animal *under state law or municipal ordinance*," such as an animal—including a bird—that has been seized and impounded. The section then applies to persons such as officers who seize animals under section 821.022 and persons who work at facilities such as animal shelters. *See id*. §§ 823.001 (defining "animal shelter" to mean "facility that keeps or legally impounds . . . animals"), 821.022(c) (officer executing warrant shall cause the animal to be impounded).[8] In contrast, section 821.003 primarily addresses private facilities or individuals who own or transport live birds.

As to chapter 829, appellants urge that it shows that the legislature "recognized the direct link between animal welfare and human health and safety." Sections within the chapter require the Department to "prescribe the standards and curriculum for basic and continuing education animal control courses" and to offer basic animal control courses. *See id*. §§ 829.003(a), .004. But the legislatively prescribed requirement that DSHS offer animal control courses actually supports that DSHS does not have a mandatory, nondiscretionary duty to enforce 821.003. In contrast with the express requirements in chapter 829, chapter 821 does not contain a provision expressly requiring DSHS to enforce section 821.003. *See City of Rockwall*, 246 S.W.3d at 629 (declining to read additional words into statute in construing statute); *Osterberg v. Peca*, 12 S.W.3d 31, 38 (Tex. 2000)

---

[8] Subsection (b) of section 821.002 also allows "any person" to provide food and water as necessary if the animal is "without necessary food and water for more than 12 successive hours." Tex. Health & Safety Code § 821.002(b).

(courts "should not presume to add" to statute when legislature has demonstrated it "clearly knew" how to add phrase in other parts of statute). Rather, it expressly provides a mechanism for the enforcement of section 821.003 through local law enforcement.

Further, the legislature separately granted DSHS authority with discretion to investigate egg production facilities in other chapters of the Health and Safety Code, such as chapter 81. *See, e.g.*, Tex. Health & Safety Code §§ 81.003 (defining communicable disease to include "illness that occurs through the transmission of an infectious agent or its toxic products from a reservoir to a susceptible host, either directly, as from an infected person or animal, or indirectly through an intermediate plant or animal host"), .021 (requiring board to "exercise its power in matters relating to protecting the public health to prevent the introduction of disease into the state"), .061 (requiring department to "investigate the causes of communicable disease and methods of prevention" and authorizing it to "investigate the existence of communicable disease in the state"), .064 (authorizing department or health authority to inspect "a public place" to prevent communicable disease and defining "public place" to mean "all or any portion of an area, building or other structure, or conveyance that is not used for private residential purposes, regardless of ownership").

Appellants argue that an officer's authority to enforce section 821.003 is dependent on the receipt of information from DSHS. Appellants urge that, because DSHS has refused to investigate egg production facilities and report purported violations to appropriate officers, the officers are unaware of violations and unable to exercise their enforcement authority. Thus, appellants contend there is no current enforcement of section 821.003, "egg producers continue to freely operate in violation of the law," and, if DSHS does not have a duty to enforce the statute, "no

10

agency in Texas has the duty to ensure basic sanitary conditions in Texas egg producing facilities." Appellants, however, concede that DSHS "has extensive authority to address sanitation issues in egg-production facilities under the agency's general powers" and that "the only enforcement mechanism within chapter 821 itself is through peace and animal control officers."

We also note that other governmental entities are authorized to inspect egg production facilities. *See, e.g.*, 21 C.F.R. § 118.12 (authorizing the federal Food and Drug Administration to inspect egg production establishments); Tex. Health & Safety Code § 81.064 (authorizing "health authority" to inspect public places). And section 821.003's requirement that an officer "have reason to believe" and to obtain a warrant to seize an animal squares with the section's inherent penal nature. *See Granger v. Fold*, 931 S.W.2d 390, 392 (Tex. App.—Beaumont 1996, orig. proceeding) (recognizing that defendant subject to civil proceeding under chapter 821 "entitled by right to all those guarantees affording full due process" because defendant may be subject to "loss, forfeiture and confiscation" of the animal under section 821.023); *see also* Tex. Penal Code § 42.09 (offense of cruelty to livestock animals).

Reading the plain language of section 821.003 in the context of the statutory scheme, we decline to construe section 12.021 to place a mandatory, nondiscretionary duty on DSHS to enforce section 821.003 as requested by appellants. *See Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d at 628.

## CONCLUSION

We conclude that the trial court correctly found that it did not have jurisdiction over appellants' claims against DSHS and its commissioner. *See Miranda*, 133 S.W.3d at 227. Thus, we

overrule appellants' issue and affirm the trial court's order that granted appellees' plea to the jurisdiction.[9]

_____

Melissa Goodwin, Justice

Before Justices Puryear, Rose, and Goodwin

Affirmed

Filed:   February 19, 2014

_____

[9] Because we construe the statute based on its plain language, we do not address the parties' arguments about legislative history. *See* Tex. Gov't Code § 311.023(3) (stating that court "may consider among other matters . . . legislative history"); *see also id*. § 311.016(1) ("'May' creates discretionary authority or grants permission or a power.'"); *City of Round Rock v. Rodriguez*, 399 S.W.3d 130, 137 (Tex. 2013) ("When a statute is clear and unambiguous, we do not resort to extrinsic aides such as legislative history to interpret the statute.") (citations omitted). Further, given our conclusion that the trial court correctly determined that it did not have jurisdiction, we do not address other possible jurisdictional barriers to appellants' claims, such as sovereign immunity or other possible grounds for concluding that appellants lack standing. *See Andrade*, 345 S.W.3d at 7 (addressing standing generally); *Texas Dep't of Ins. v. Reconveyance*, 306 S.W.3d 256, 258–59 (Tex. 2010) (deeming allegations and requested declaration "in substance *ultra vires* claims" and dismissing claims against governmental entity); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 (Tex. 2009) (explaining that suits seeking to restrain official conduct that is ultra vires of an agency's statutory or constitutional powers "cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity" because "'acts of officials which are not lawfully authorized are not acts of the State'") (citation omitted).